Our first case of the morning is In re the Marriage of Notter 412-1130 for the appellate Ms. Polinski, is that the correct pronunciation, and Mr. Panicki for the appellee, you may proceed. Your honors, counsel, may I please the floor? In re the Marriage of Notter began in 2009 when the parties separated and Mr. Notter, my client, filed for divorce. At that time, there was no petition to remove on file, but shortly after that a petition to remove by Ms. Notter was filed with the court in Lecoupen County. That hearing was held over a three day period, whereby the court denied the petition to remove, Divorce was later entered, my client had visitation, Ms. Notter had custody, living in the marital residence, all in Lecoupen County. The second petition to remove was filed. Another hearing was held, although a very abbreviated hearing based on the facts that the judge had heard all of the evidence previously and only the differences or modifications or additional facts came into play during that hearing. The court ruled that at this point in time it was in the best interest of the minor child to be allowed to move to Texas, then the appeal was filed, of course. The court erred in Lecoupen County based on Eckert as well as quite a few Fourth District cases regarding the factors that are required for a person to be allowed to remove a minor child. The factors, and I can go through each one individually, I understand the court is very familiar with all of the factors dealing with removal, Eckert has been around for quite a while and this court has addressed those as well. Ms. Notter did very little, if anything, during the entire proceedings of this case from 2009 when the parties separated through even the present day to enhance her life or her child's life in any way except moving to Texas. A background of that which was brought forth in the first removal hearing was Ms. Notter arrived, I guess you could say, in Madison, Lecoupen County when she was in college with her mother and stepfather. Her stepfather was in the military. They traveled quite frequently while she was growing up. Her and her brother remained. When her stepfather retired, the mother and stepfather moved to Texas. April Notter remained in Madison County, continued at school. Her brother remained in high school in Madison County, didn't move to Texas until several years later. April and Robert finally got married and of course started their family. April did nothing but sit and wait out the time she could to file another petition to remove. She admitted in the second hearing that she stated under oath, to answer honestly, I don't feel I should have to sacrifice my time with my son to get an education. She's moving to better my life. It's still my opinion. It's more beneficial for me to be down there than in the state of Illinois. Why can't the trial court evaluate that in the way that some of the cases have? The benefit to her and the benefit to her family unit because of the economic viability of being able to live with a parent and have expenses taken care of while you're educating yourself versus trying to commute rather long distances and pay tuition, et cetera, and why can't the court evaluate and say that would be in the best interest of the child as well or that the child would receive what used to be called incidental or collateral benefits? Well, the court here did determine that. The facts though, that's against the manifest weight of the evidence with what was brought forward. Ms. Nodder, if the court allows a mother or a custodial parent to remove a child based on the fact that I can go live with a parent, I can attend school, I don't have to work, she did all of those things while remaining in Macoupin County for four years. She looked for jobs only in Staunton, Illinois, within the city limits of Staunton, Illinois. She did not look at any other schools in the area. Springfield is not that far from Macoupin County where she resides and there is a school with the degree program she wants. And it's also, I think, very important to realize that she switched her degree. She was at SIU Edwardsville for teaching, quit that when she had her child and didn't go back to school. She wants to start over with something totally new because that's what I want to do. Everything is about what she wants to do, not necessarily what should happen when you have a third party, a child involved in this, where the father has exercised his visitation, he has done what he can as a father. The child and the mother have resided in the marital residence while he resides with his parents to keep the continuity so that they can all have the same and frequent contact with the child. Well, speaking of continuity and improvement, what has your client done to get the supervised visitation restriction lifted during this period of time? During the first part of the case, 2009 through 2010, he was seeing a counselor. He was on medication that through, I believe, 2011. In 2011, he was released from care by that doctor, not cut off his medication, his medication was discontinued, deemed that it was no longer necessary, and no further appointments with the counselors or the psychologists were recommended or needed. Unfortunately, that's not, that hasn't been good enough for Ms. Nodder and the court. I have sent my client back on several occasions. What the court wants, according to the order and according to what Ms. Nodder has requested, is the doctor to say there is no concern, not that there's no concerns, that nothing is going to happen. The doctor cannot make that determination. I mean, there's been a shooting here this morning down near Jacksonville. Nobody can guarantee that. I'm not saying that's what my client would do. I'm just saying that a doctor, a psychologist, will not give a guarantee that he is 100% perfect and there is absolutely nothing. He can't do that for any of his patients. Right. But did your client file anything with the court saying, please lift this restricted or give me more expansive visitation or let's have a trial period? That has, no, there's been no motion filed that has been addressed at almost every court appearance, I guess you could say, with Ms. Nodder's various attorneys. We've discussed this. I have discussed this with counsel and whatnot. My client has gone back. I've discussed with the counselor what they're looking for. Again, the counselor has told me, I'm not going to give you any guarantees. I won't give you a guarantee that the mom's not going to do anything to this child if I were to see her. I don't know. But he does not need treatment. He does not need medication. He had to start over again with this counselor. What did anybody get from the counselor? Did the counselor ever testify? The counselor did not testify. Did the counselor ever provide an affidavit? Was the counselor ever deposed? The counselor was not deposed, no. The counselor provided a letter, a medical record saying that he was no longer under the needing of treatment and his medication was discontinued. I don't believe it was that. Why did he make new appointments after this petition was filed? Because we were informed that there would be no, he had to go back. The court basically indicated until I get something saying from the doctor that there's no concerns, he's going to remain with supervised visitation. He is, not to make excuses, he's a very simple person. Both of the parties are fairly simple people. They are not, my client is not well educated. He graduated from high school, went straight to work. He does basically, he doesn't understand, he doesn't understand why he has to keep going back to the doctor when the doctor says you don't need to be here. He's trying to do what he can but it just hasn't been fulfilled. It hasn't been that big of an issue in the sense that he's been residing with his parents so that has helped. He doesn't mind residing with his parents if his ex-wife is in the marital residence or the child's in the residence. Ms. Notter had basically put forth in her second petition all of the things that she had done during that two year period. She applied to two schools in Texas. She applied to jobs only in the city limits of Staunton, not anywhere outside of Staunton like Springfield, Edwardsville, any of the areas that might be hiring and might pay more than parties might pay or something to that effect. She testified in court at the second hearing that the reason she hadn't gotten a job or applied to school in any of the bi-state areas was because she wants to move to Texas. So her whole existence for the last four years has been to buy time to get to Texas. It's your concern that she's going to try to make this a permanent move, is that right? That's correct. The court made it reviewable though, correct? The court did make it reviewable once she graduates. However... Practically then speaking, how do you foresee that flying out, the review process? Once she graduates, I would assume that we would be filing if her attorney didn't, that she had graduated. Mr. Panicki has been very good in providing us with her schedule for this year for school and whatever the degree program entails and what she will need to do. I will be filing a petition to review the removal. My concern as well as my client's concern based on her own testimony and her own beliefs that all she's wanted to do since the divorce began was to get down to Texas. She has really no incentive to find a job in this area. She's going to Texas. She's going to, I assume, find a job down there. She hasn't wanted to remain in the area close to where the child has grown up and where the child's family is to go to school or work. Yes, she could certainly come back and surprise all of us, but my intention would be when I find out when she's graduating, if she's allowed to remain in Texas, to file a petition to review that. However, that's up to three years of this child's life where he sees his father one week in the spring, six weeks in the summer, and a little bit in the fall. The child's used to being with him on Wednesdays and every other weekend. I understand that the court can consider various factors in the cases that have been cited by both parties. Most of the cases have allowed removal, but the fact basis on each of those cases are different where either the custodial parent was remarried and the new husband was transferred or lived somewhere else or there was family along with the ability to remain at home. I believe it was Maine where the mother wanted to move to Florida where her mother lived, but she also had a job in Florida. The father made enough money that he could fly back and forth almost on a monthly basis. Another case, I believe it was either Creighton or Ford, Ford was where the mother wanted to move to Colorado to be with her fiancé. She worked in a bar at night three nights a week. The father saw the child every other Saturday to Sunday. There wasn't the continuity that this child has. Ms. Notter made a big deal about how the child in Texas will be in Head Start. That's where the child was in the Head Start program in Macoupin County. The child's move is just to make her life easier. She's an adult. She's a parent. It would be great to say, I don't like family law, but I'm not going to take my life and turn everybody in my family upside down so I can go do something differently. I'm doing what adults do. I got a degree. I got a job. I'm doing it. She's doing only what she needs to do to get to Texas. There are schools all over St. Louis, Springfield, all around the area that she could have gone to. She testified there's some benefit in attending school in Texas, the fact that her mother's going to be there. You also mentioned three years ago, didn't she testify this school, I guess on somewhat of an expedited basis, would be done in 18 to 24 months? 18 to 24 months. I made the comment for three years because she started in January. I'm not sure how the whole degree, two to three years, 18 months to three years would be how long she's down there, plus whether she has a job when she graduates. Counselor, your arguments are reasonable, and I suspect the opposing counsel's arguments are going to be reasonable, too. They were made in the trial court. The standard of review is manifest way. Is the opposite conclusion clearly apparent here? I believe so. There's nothing that has changed from the first denial, the denial of the first petition to remove. Nothing has changed except that the child got older and she still did absolutely nothing except apply for minimum wage jobs all around the Staunton area. None of them were outside the city limits. She did absolutely nothing except go back and forth to Texas. Her mother resided with her in Macoupin County. The entire time that these petitions were on file, even after the first removal petition was denied, her mom didn't go return to Texas and live. She remained with April in Staunton. The facts that have, I guess, yes, you could certainly say that the court looked at the facts and decided this correctly. I guess that means that any parent who wants to move just needs to sit around as long as it takes for a court to say, okay, you haven't found a job. You haven't gotten into school. Yeah, it might be kind of rough on you to have to work and go to school like a lot of adults do, but don't worry about it. You can go on and move and, you know, you won. The court gave her exactly what she wanted by sitting there doing nothing. She is an adult. She did nothing differently except, well, she did less in the two years after the first petition to remove was denied than she did beforehand. She did seek employment before. I guess she really didn't do much. She didn't do anything differently. I'm trying to give her the benefit of the doubt. And I understand that. As I stand here in the beginning, I believe she wanted to take this child from his father. I don't believe that now. But I believe that her motives are selfish, self-centered, and only to suit her purpose. She is not looking at how close this child is to his father and how this will affect the child. Basically, she is going from a home that she was supported in to another home that she's supported in, going to school. Again, and maybe I just am bitter that, as an adult, I think she should take responsibility for herself. Get a job, go to school. Get student loans, go to school. You can do that without moving to Texas. And if her mother stayed for four years, sure. Her mom didn't want to stay. She wanted to go back down to her property that her deceased husband had purchased in Texas. She could have done that. She never did. The crux of this is that the judge's ruling is against the evidence or the factual basis because the facts were the exact same as they were two plus years earlier when we had the hearing the first time on her petition. The child's life was the same.  will be with his grandmother. In this area, in Illinois, the child went to Head Start, was with his grandmother, as well as his other set of grandparents. Mr. Notter has five siblings that they see regularly. None of these people can travel or have ever traveled except for one sister who has gone to Florida to Disney and things like that with her family. This family is rooted in Macoupin County. Right or wrong, they don't have the means to see Evan if he's allowed to be in Texas. They will see him when he's here three times a year. And as the child gets older, if the child remains in Texas, six weeks over the summer is going to be even more difficult if the child, he's only five now and he'll be in kindergarten starting this fall. If he does sports or does anything that would not enable him to come for the certain break, that would cut Robert's family out even more. Well, was the mother's, do you think the mother's credibility was impeached regarding, you said there was a program in Springfield. Correct. She says the ultrasound programs are in other locations. Did she specific, did she say no, there isn't one in Springfield or did you prove there's one in Springfield? I don't, my understanding was she was going to have to commute. Correct. And starting in Springfield I guess is different than starting to take a look. The difference of a good half hour, yeah. How long? About a half hour. Okay. And regarding the reliability of her car. Again, not to be callous, but if she had been working for the last two years, if she had done something to, when and if. So she applied for jobs, got them, but didn't take them because they were minimum wage? I don't know that. Mr. Panicki can probably answer that. All I know is she applied. Well, it shouldn't be for him to answer it. It should be for the record to answer that. Correct. She applied for 21 or 41, I can't remember the number, of jobs in Staunton. But the record doesn't tell us whether she was offered them? To my knowledge, she did not get any of those jobs. Unfortunately, Staunton is a very depressed area at this point in time and has been. And there was record made, there were job opening signs in Edwardsville. Yes, it is about 30 minutes from Staunton. She didn't want to drive 30 minutes because her car wasn't very good. We've all, I don't know about your personal lives, but I drove a really, really bad car in law school and I worked. I worked two jobs, went to school. That's what reasonable people do when they have responsibilities. She has not taken any responsibility. She has let her ex-husband support her, her mother support her, and as she says, words out of her own mouth, I do not feel I should have to sacrifice my time with my son to get an education. I'm sorry. Thank you, counsel. We'll hear from you on rebuttal. Mr. Court, counsel, I'm very sympathetic to Mr. Notter. He is challenged and I'm sure that he loves his son very much and misses his son. This is always a sad situation. I take exception to Ms. Belinsky, who's been a very good attorney in this case, but I take exception to her saying it's an abbreviated hearing. It was a hearing. We had all the time in the world to bring any witnesses or evidence we wanted to before the court. There was nothing curtailed about it or shortened about it. I don't know why the attorneys from Chicago took three days to put on a case for removal four years ago, but we put on our case at a date. And I disagree with her when she says nothing has changed since the first hearing. Judge Deal said that things have changed since the first hearing. I think the age of a child makes a difference in terms of travel. It's hard to travel with an infant in the backseat of your car. It's a little bit easier to travel with a five-year-old who can talk to you and explain things so you don't have to give a five-year-old as much attention as you do an infant. So I think that's a factor. I think he said that, well, in the visitation provisions of the judgment, there are provisions for Mr. Notter to remove the supervision. And the idea that no psychiatrist or psychologist will guarantee that he would never harm his child is a red herring. Nobody asked for that. There are provisions in there that he could go through. But the fact of the matter is he didn't see anybody until just weeks before the hearing at the date of the deposition, I believe, he made his first appointment. So he didn't do anything to remove that supervision. Well, what were those provisions? What did he need to do specifically? I'm going to apologize. I don't have the exact words. Continue with counseling? Have the counselors report to the court in written form, but it doesn't require a guarantee that he would never hurt his child. I apologize for not knowing the exact description. Well, the counsel made reference to a letter that was submitted at some point which said I've released him from my care or he's completed and his medication is going to be either reduced or eliminated. I don't believe that letter was ever made part of the record. I don't believe that's part of the record. It might have been referred to during testimony, but I wouldn't have let that letter come in without cross-examination, so I don't believe that letter is part of the record. I'm sure it was referred to, though. Do you dispute that at some point some psychiatrist or counselor or psychologist apparently did say I don't need to treat you anymore? I dispute that that happened since the judgment was entered, coming up with a way for him to remove the supervision, yes. And then the other thing is, again, I'm not sure. You know, this was a whole new hearing. The judge made his decision based on the facts that were reduced at this second hearing, but the court also found, also mentioned that at the first hearing she had preliminary plans for education and employment opportunities, and the court found that now those had come to fruition and that she had definite plans. She was admitted into a school. Eighteen to 24 months was the expected time it would take her to graduate, and she testified without contradiction that a person in that position with that training could make about $60,000 a year out of school, which is wonderful. And this shouldn't be about April. We're not here to punish April for what she did or didn't do, whether her mother supported her or her husband supported her, as he was required to do under the judgment until that house sold. But the point is this isn't about April. This is about Evan. Is Evan's life going to be better? In some respects, yes. His mother is now probably 18 months away from making a good living from him, and Mr. Nodder has more overnights than he had under the judgment. He has 55 overnights. He got 52. And I agree that I'd rather have my children every week than three times a year, summer, Christmas, and spring break. But nevertheless, there's a case, Ford v. Martinus, that says if that's the standard, then we could never allow removal except for neighboring states, St. Louis or Iowa, that kind of thing, because we're always going to congregate the visitation into larger lumps but spread out over longer periods of time. Mr. Nodder makes $51,000 a year. He's smart enough to make $51,000 a year. I believe he could travel to Texas to see his son. I don't think it's a terrible handicap. I don't think he's unable to see his son. Ms. Polinsky referred to the main case and that standard of review. Well, you referred to the standard of review. It's got to be clearly against the manifest way to the evidence, or there's got to be no reasonable basis for the court to make its decision. The court weighed the evidence and found that Evan's life inevitably would be better. One more thing I'll mention, then I'll sit down unless the court has any questions, is that credibility was an issue. It's always an issue in court. They found that April's credibility was high and that Robert had some problems. I just think this is a fact-based case and the court made its decision. If you have any questions, I'll answer them otherwise. Thank you. Mr. Panicki, I do have a question for you. I'd asked the opposing counsel about the reviewability portion of the trial court's order. At page 6 of your brief, you indicate that if your client attended school in Texas, she'd be allowed to come back and be employed in the state of Illinois as an ultrasound technician. The next page, she says she is living in Texas. The plan would be to eventually seek employment in Texas. What was presented to the court just in terms of the intentions of your client? Is she wanting to go to school there and then return to Illinois, or is she wanting to permanently move to Texas? What do you envision the review encompassing for the trial court? She could come back to Illinois. She wants to stay in Texas. When she graduates, I don't know what would happen. I presume the court would question her as to what efforts she's made to find employment in all places and where the best employment would be for her in her assignment. There's no requirement that she seek employment in Illinois following the completion of this program. It's just a requirement for a review, but there's no requirement that she seek employment in Illinois or move back to Illinois, or that if she were offered a job in Texas and Illinois, that she automatically choose the one in Illinois. Have you found any case, or maybe you haven't had any reason to, I've never seen a case where somebody granted a petition to remove, and then a couple of years later, possibly at the outside, three years, but let's just say two years, 24 months, the judge is going to review it and say, well, you've got to bring the child back. How does that happen? If we're talking about permanency and continuity, I don't know, you and or your client would be saying, no, no, you can't make me do that. I've established my life here if she gets employment in Texas. I just don't understand. I understand review as to maintenance. Review as to removal seems to me to be a fairly permanent thing to occur. I agree with you. I would say, let's say she drops out of school, something of that nature, and doesn't continue to do what she said she would do. I think the court would be entitled to review at that point and say, we gave you the opportunity to do this, and the answer is no. I don't know of a case where it's been brought back, but the point is if she doesn't carry through with her plans, there's a mechanism for the court to look at that. If she does, then I would agree with you that probably continuity and stability and all of that would be in favor of staying in Texas. I would agree it would be difficult, it would be strange circumstances for a court to order her to come back after she's graduated and has opportunities in Texas. It's a de facto privilege. Counsel, I just as a connect, I found the review portion unique. I'm not sure that I've seen that before. Is this common practice to your knowledge? To my knowledge, I've been doing this 43 years, and I've never seen it done before, but I think the court cares and wants to make sure. I think the court cared for Robert and wanted to make sure that everything was done for Evan's best interest and if things changed, that the court had a vehicle to change the decision. Thank you. Thank you, Counsel. Thank you. I'll just touch on a couple of things. With respect to the Ford case, Mr. Panicki is correct in what the court stated, that it would only be maybe a bi-state type move, except that those facts were quite different. That mom was engaged to be married. She worked nights, was not home during the evenings with her child. She shared a bedroom with the child in Illinois. Moving to Florida, she would live and the child would have his own room, she would have her own room, and she would be married. The father only saw the child on Saturday. From Saturday, I believe it was 9 a.m. to Sunday at 6 p.m., no other visitation time. In fact, I believe, if I remember the facts correctly, the father had wanted the mom to get an abortion and didn't want to have anything to do with the child early on, and it wasn't until the mother requested child support that he actually got the visitation. And his visitation was more than that, that's all he exercised. There would also be two incomes and mom could get a day job. I'm sorry, I believe that was Colorado, not Florida, that her fiancé resided in the Greeley, Colorado area. With respect to the provisions to get the restrictions lifted, the letter from the doctor was provided to the Chicago council and possibly Mr. Bellum, her first attorney, during this case. And it wasn't any guarantee, it was stated that he's been released from my care, no further appointments necessary or something to that effect. That hasn't been good enough, so I've been... Is that in the record? It is in the record from, I believe, the first hearing. And you think it was admitted, the record was admitted. I don't mean that it was testified to, I mean that the... I can't answer that, honestly, I'm sorry, Your Honor. The credibility issue, yes, the court found that April was credible. Again, credibility, she was credible. She admitted that she only sat around for two years because she wanted to move to Texas. I believe her. But I don't believe that the court should allow someone to take the child from the family that he has because you want to. She doesn't have a fiancé, she doesn't have a job waiting, she has a school waiting, but there are Sanford Brown schools closer that she could go to. She could move to St. Louis with the child and work and do what other people do. Well, what would be the difference between living with a mother and having your finances taken care of versus a full scholarship? I mean, if this was a full scholarship situation and that was a school in the country that was going to offer a full scholarship, most families would say, that sounds pretty good. Take it. Right. Well, then how is it different when she's lucky enough to have a parent that is willing to provide for her so that she can go to school apparently without incurring debt and while there being, I guess, care or convenient care and schooling for her child? And she doesn't have to work. Because the child would be removed from the family that he knows and his best interests, I don't believe, are being served by basically being ripped from the family that he's known his entire life. Does this record show the closeness that you assert with the father's family? Yes. How does it show that? There was testimony with several of the aunts and grandparents. Was that the first hearing or the later hearing? The first hearing. First hearing. We took the, we agreed, it wasn't, I abbreviated, it was probably a bad word for that, that nothing had changed with respect to the family aspect so we did not take any new testimony. If that's not in the second hearing, not to suggest that it still wouldn't be available evidence, but if it's over a two-year period, how does the trial judge know that that level of closeness has been maintained when all the visitation has been supervised? How is it that you continue or nurture a relationship with grandparents and aunts and uncles and cousins if you're only getting supervised visitation with your father? Well, it's with both parents or any of his family. Those are the people who are providing the supervision? Yes. The family is together quite frequently. There's a lot of young kids. They watch each other's kids. So the supervision is the child comes perhaps to Robert's home where he lives with his parents and then they are there or other family members and they're providing that supervision? Correct. He might go to a sister or someone's house like that, yes. And that is, then hitting on another thing with respect to the review, that is a very big concern. And in doing this again for several years, I've never seen this either. That is my client's concern. If we had a requirement that the child would have to be brought back and if no job could be found in Illinois, then we'd readdress the issue of removal. That would be one thing. But if she gets a job in Texas, she has no incentive to look anywhere else. Thank you, Gary. Thank you. We'll take this matter under advisement. So I came up early. I figured I'm going to teach you all that you've been listening for. I'm teaching you the research. Anyway. I know your name. I guess that was it. I don't know a lot about it. We're on federal grants. Eric. Good job. It's nice working with you. Exactly. Nice to meet you.